**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NEW YORK**
_____

**UNITED STATES OF AMERICA,**

        **Plaintiff,**

        **v.**                     **05-CR-284S**

**MICHAEL ZEIGLER, JR.**

        **Defendant.**
_____

## REPORT, RECOMMENDATION AND ORDER

      This case was referred to the undersigned by the Hon. William M. Skretny, in accordance with 28 U.S.C. § 636(b)(1), for all pretrial matters and to hear and report upon dispositive motions.

## PRELIMINARY STATEMENT

      The defendant, Michael Zeigler, Jr. ("the defendant"), is charged in a one count indictment with having violated Title 18 United States Code, section 922(g)(1). (Docket #1).  The defendant has filed a motion to suppress evidence seized while an arrest of another individual was being conducted on October 7, 2004 at premises located at 68 Forman Street, Buffalo, New York.  A suppression hearing was held by this Court on February 17, 2006.  The government called Special Agent ("S.A.") Corrigan of the F.B.I., Special Agent ("S.A.") Gillette of I.C.E., and Agent Jay of the

Border Patrol as witnesses.  The defense presented no testimony or other evidence.[1]

Post-hearing briefs were filed by the defendant and the government on March 10, 2006.

(Docket #s 11 and 12, respectively).

## **FACTS**

S.A. Thomas Corrigan of the F.B.I. testified that on October 7, 2004 at

approximately 7:08 a.m., he, along with a number of law enforcement officers,

approached the premises located at 68 Forman Street, Buffalo, New York for the

purpose of effectuating an arrest warrant for one Vienniea Blazer ("Blazer") who resided

there.  (Government Exhibit 1 was received at the hearing and is a copy of the

aforesaid arrest warrant).  S.A. Corrigan was the "team leader" of the group and was

wearing F.B.I. identification apparel, blue and yellow in color with the letters "FBI"

printed on the front and back.  He approached the residence at the side door entrance

and knocked on the door but received no response.  He then proceeded to the front

door of the residence where he "knocked hard on the door" and "yelled loudly" that he

was the F.B.I. and that he had an "arrest warrant."  He also rang the doorbell at the

front door but still received no response.  However, he saw a light go on in the house

and observed a male looking out the front window with whom he made "eye contact."

He heard "people running and commotion inside the house."  He repeated his knocking

and yelled "arrest warrant for Blazer and asked for the door to be opened."  He then

---

[1] The proceedings were electronically recorded but no transcript of the proceedings was ordered by either party.  Therefore, this Court has relied on its hearing notes as to the evidence presented at said hearing.

returned to the side door of the residence and repeated his announcement, and while "looking through the window of the door, observed Blazer inside the house." However, Blazer refused entry to the house and "yelled profanities and told them to go away." He displayed his official identification credentials and once again advised that he was from the F.B.I. and that they were there to arrest her. At this time, Blazer was on the other side of the door and looked through the window at S.A. Corrigan's credentials. He then displayed the arrest warrant at the window of the door but Blazer continued to "act in a hostile manner." Thereupon, S.A. Corrigan and his fellow officers made a forced entry into the house by kicking in the side door and proceeded into the kitchen area of the house where Blazer was standing and continuing to yell and be "non-compliant." She was then forcibly arrested and handcuffed. While this was occurring, S.A. Corrigan observed a male coming up the basement stairs in a "quick and suspicious fashion" into the kitchen area and appeared to be heading towards a bedroom. S.A. Corrigan ordered him to stop and put his hands up, which he repeated and further ordered this male to lie down on the kitchen floor. The male, who is the defendant, stopped but did not immediately put his hands up when first ordered to do so. Ultimately, the defendant did comply and lay down on the kitchen floor and he was handcuffed. This was done "in order to render the residence safe." The defendant was then asked if there were any guns in the house to which he responded that there were not. He was not under arrest at this time but rather was "put into investigative detention" and held in this capacity for approximately fifteen minutes before he was formally arrested.

S.A. Gillette entered the house and saw that Blazer and the defendant were under the control of the other agents.  He then began a safety search of the other areas of the house.  He went to a bedroom located approximately five to ten feet away from the kitchen and "observed some bullets in plain view on top of a laundry basket in the bedroom."  He checked this bedroom "to make sure no one was in there" and looked in the bedroom closet whereupon he observed the "backside of a handgun on the top shelf of the closet."  He announced these findings to his fellow officers and secured this bedroom area to make sure no one could pose a threat to the other officers.

Upon hearing S.A. Gillette's announcements of ammunition and a gun, Agent Jay, who was in the kitchen with the handcuffed defendant, asked the defendant if there were any other weapons in the house.  The defendant first responded by saying "no" to his inquiry about other weapons but then stated that "there is possibly a weapon in the area of the bed."  S.A. Corrigan testified that the defendant stated that he had a "few guns in the house" and that there was "one on the bed."

Agent Jay then went to the bedroom where S.A. Gillette was standing guard and looked for a gun on the bed but did not find anything.  He then looked in this bedroom closet and retrieved the gun that S.A. Gillette had first observed, and while doing so seized a second weapon in that closet which he found underneath a blanket.

The agents completed a "protective sweep" of the house but nothing further was found or seized.

In the meantime, S.A. Corrigan "called in" the defendant's biographical information and a criminal history was run.  He was advised that the defendant had prior felony convictions and, therefore, should be arrested on the gun charge.  The defendant was placed under arrest at approximately 8:00 a.m. on October 7, 2004.  After being placed under arrest, but without any questions being put to him, the defendant "voluntarily" stated that "he would take responsibility for the guns."

The total time from the arrival at the premises at 68 Forman Street to the arrest of the defendant was approximately 30 to 45 minutes, some of which was expended waiting for the arrival of someone to take care of the children who were in the house.

## DISCUSSION AND ANALYSIS

### 1.    Standing By The Defendant To Move To Suppress:

In its response to the defendant's motion to suppress evidence, the government asserts that the "defendant failed to properly assert that he has standing to contest the search of 68 Forman Street, in the City of Buffalo" in that the "defendant has alleged no facts in support of his application."  (Docket #7, pp. 3, 4).

In order to establish a violation of his Fourth Amendment rights, the defendant must meet a twofold requirement, "first that [he has] exhibited an actual (subjective) expectation of privacy and second, that the expectation be one that society is prepared to recognize as 'reasonable'." *Katz v. United States*, 389 U.S. 347 (1967).

The defendant has met this twofold requirement.  In his affidavit sworn to December 29, 2005 in support of his motion to suppress, the defendant asserts that he was "arrested on October 7, 2004 in [his] residence at 68 Forman Street in the City of Buffalo" and that the "officers searched ["his] residence" without "receiv[ing] [his] consent to do so."  (Docket #6, Defendant's Affidavit sworn to December 29, 2005, ¶¶ 2, 5).

The Fourth Amendment guarantees the "right of the people to be secure in their . . . houses . . . against unreasonable searches and seizures . . . ."  United States Constitution, Amendment IV.

The defendant has asserted under oath that the premises located at 68 Forman Street in the City of Buffalo was his place of residence on October 7, 2004 when the agents conducted the search and seizure in question.  The term "residence" as used by the defendant in his affidavit is synonymous with the term "house" as set forth in the Fourth Amendment.  It is axiomotic that since one's "house" or residence is deemed to be one's castle, society clearly recognizes that it is reasonable for the resident of one's house to have an expectation of privacy within that house, free from

unreasonable invasions or searches and seizures by government agents.  Therefore, I find that the government's argument in opposing the defendant's motion to suppress the evidence seized on the basis of "standing" is without merit.

### 2. Search Of The Premises And Seizure Of Evidence:

In support of his motion to suppress the evidence seized from the bedroom of the premises located at 68 Forman Street, the defendant argues that the search conducted in the premises "was overbroad since it was not based on any articulable or specific fact" and apparently because it was conducted after Ms. Blazer had been placed under arrest and handcuffed.  (Docket #11, p. 3).  This conclusion by the defendant is based on his assertion that "the police were present solely to arrest Ms. Blazer for marijuana related activities" and that "there were neither allegations of weapons nor suspicion of violent behavior" and since it was "7:00 a.m. on a weekday morning there was no reasonable expectation that anyone other than Ms. Blazer and her family would be present in the house" and therefore, "there was no articulable indication to the officers that any danger was present at the scene."  (Docket #11, p. 4).

This position put forth by the defendant ignores the facts as established by the uncontroverted testimony of S.A. Corrigan wherein he stated that after knocking on the side and front doors of the residence and announcing their identity and purpose for being there, he observed a light go on in the house and observed a male looking out the front window and that he heard "people running and commotion inside the house."

The forced entry by the agents into the residence was legal when Ms. Blazer failed to respond to their request to allow entry.  As the Court of Appeals for the Second Circuit has stated:

> Generally, the police do not need a search warrant to enter a suspect's home when they have an arrest warrant for the suspect. . . .  Agents may enter a suspect's residence, or what they have reason to believe is his residence, in order to effectuate an arrest warrant where a reasonable belief exists that the suspect is present.

*United States v. Lauter*, 57 F.3d 212, 214 (2d Cir. 1995).

The agents were on the premises for the purpose of effectuating a warrant for the arrest of Ms. Blazer, who was a resident of the premises.  "If there is sufficient evidence of a citizen's participation in a felony to persuade a judicial officer that his arrest is justified, it is constitutionally reasonable to require him to open his doors to the officers of the law.  Thus, for Fourth Amendment purposes, an arrest warrant founded on probable cause implicitly carries with it the limited authority to enter a dwelling in which the suspect lives when there is reason to believe the suspect is within."  *Payton v. New York*, 445 U.S. 573, 602-603 (1980).

S.A. Corrigan observed the woman whom he believed to be Ms. Blazer within the premises at 68 Forman Street and for whom he had an arrest warrant on October 7, 2004.  Therefore, he and the other officers had a legal right to make a forced entry into her residence so as to effectuate said warrant when she refused to comply with their request to allow entry.

Once inside the premises, the officers had a legal right to take precautionary steps to assure their safety.  This included the handcuffing of the defendant and conducting a "protective sweep" of the premises.  As the Supreme Court of the United States has ruled:

> A 'protective sweep' is a quick and limited search of premises, incident to an arrest and conducted to protect the safety of police officers or others.  It is narrowly confined to a cursory visual inspection of those places in which a person might be hiding.
>
> *   *   *
>
> In Terry and Long we were concerned with the immediate interest of the police officers in taking steps to assure themselves that the persons with whom they were dealing were not armed with, or able to gain immediate control of, a weapon that could unexpectedly and fatally be used against them.  In the instant case, there is an analogous interest of the officers in taking steps to assure themselves that the house in which a suspect is being, or has just been, arrested is not harboring other persons who are dangerous and who could unexpectedly launch an attack.  The risk of danger in the context of an arrest in the home is as great as, if not greater than, it is in an on-the-street or roadside investigatory encounter.  A Terry or Long frisk occurs before a police-citizen confrontation has escalated to the point of arrest.  A protective sweep, in contrast, occurs as an adjunct to the serious step of taking a person into custody for the purpose of prosecuting him for a crime.  Moreover, unlike an encounter on the street or along a highway, an inhome arrest puts the officer at the disadvantage of being on his adversary's "turf."  An ambush in a confined setting of unknown configuration is more to be feared than it is in open, more familiar surroundings.
>
> *   *   *
>
> We are quite sure, however, that the arresting officers are permitted in such circumstances to take reasonable steps to ensure their safety after, and while making, the arrest.  That

interest is sufficient to outweigh the intrusion such
procedures may entail.

\*    \*    \*

We also hold that as an incident to the arrest the officers
could, as a precautionary matter and without probable cause
or reasonable suspicion, look in closets and other spaces
immediately adjoining the place of arrest from which an
attack could be immediately launched.

\*    \*    \*

We should emphasize that such a protective sweep, aimed
at protecting the arresting officers, if justified by the
circumstances, is nevertheless not a full search of the
premises, but may extend only to a cursory inspection of
those spaces where a person may be found.

\*    \*    \*

The type of search we authorize today . . . may be
conducted only when justified by a reasonable, articulable
suspicion that the house is harboring a person posing a
danger to those on the arrest scene.

*Maryland v. Buie*, 494 U.S. 325, 327, 333, 334, 335, 336 (1990).

Even though Ms. Blazer, the subject of the arrest warrant, had been

apprehended and placed in handcuffs, the officers had the right to continue to take

cautionary, protective action while in the premises.  This is made clear by the holding of

the Court of Appeals for the Second Circuit in *United States v. Gandia*, 424 F.3d 255

(2d Cir. 2005) wherein the Court states:

Unlike most warrantless searches, which focus on the
immediate danger posed by a suspect, a *Buie* protective
sweep allows officers to stop a potential ambush by
searching for unseen third parties.

-10-

\*    \*    \*

But as used by the *Buie* court, a "protective sweep" seems clearly to refer to a search that focuses not on "the threat posed by the arrestee, [but] the safety threat posed by the house, or more properly by unseen third parties in the house'."

\*    \*    \*

A *Buie* protective sweep addresses instead the "interest of the officers in taking steps to assure themselves that the house in which a suspect is being, or has just been, arrested is not harboring other persons who are dangerous and who could unexpectedly launch an attack'."

\*    \*    \*

The *Buie* court explicitly declined to hold that the danger inherent in executing an arrest warrant will *ipso facto* justify a protective sweep. . . .  Officers must point to facts that give rise to an individualized suspicion and cannot rely solely on generalizations that suspects are usually accompanied by dangerous third parties.

*Id.* at 261, 262, 263-264.

Prior to their entry into the premises, S.A. Corrigan observed a male in the house, heard people running inside, "people moving quickly" and commotion inside the house after he had knocked "loudly" on the front door and announced their identity and purpose for being there, *i.e.*, the arrest of Ms. Blazer.  As a result of these observations by S.A. Corrigan, it was certainly reasonable for all of the officers, upon entering the premises, to have "an individualized suspicion" that there may be a number of "unseen third parties" in the house "who could unexpectedly launch an attack" on them.

The officers had no knowledge of who the individual was or what his intent might have been when he came up from the basement into the kitchen area just as the officers were restraining Ms. Blazer.  Because of this, they had a legal right to protect themselves by taking the action that they did towards the defendant, *i.e.*, ordering him to lay down on the floor and placing handcuffs on him.  This event also did not prevent the officers from continuing the "protective sweep" throughout the remainder of the premises since S.A. Corrigan did not know how many people were "running" in the house and whether they were adults or children when he heard the "commotion inside" after "loudly" knocking on the front door and announcing his identity and purpose for being there.  Therefore, the officers had a right to "assure themselves that the house in which" Ms. Blazer had "just been arrested" was "not harboring other persons who [were] dangerous and who could unexpectedly launch an attack."  This was the reason and purpose for S.A. Gillette going to the bedroom located approximately ten (10) feet away from the kitchen.

The handcuffing of the defendant and "detaining" him before he was formally placed under arrest while the officers conducted the "protective sweep" was also legally permitted.  *See Muehler v. Mena*, 544 U.S. 93 (2005); *Michigan v. Summers*, 452 U.S. 692, 705 (1981); *Rivera v. United States*, 928 F.2d 592, 606 (2d Cir. 1991).

It was while S.A. Gillette was conducting the "protective sweep" in the bedroom that he "observed some bullets in plain view on top of a laundry basket in the bedroom" and the "backside of a handgun on the top shelf of the closet" in that bedroom.  He immediately announced to the other officers what he observed in this bedroom thereby causing Agent Jay to ask the defendant if there were any other weapons in the house to which the defendant ultimately replied that "there is possibly a weapon in the area of the bed."

> While it is true that government agents engaged in a protective sweep may not engage in a full search of the premises, but only in a search that extends "to a cursory inspection of those spaces where a person may be found," *Buie*, 110 S.Ct. at 1099, this does not mean, as [the defendant] suggests, that a protective search can involve a search only for individuals and not for weapons within the grab area of an individual whom the government agents have reasonably concluded is dangerous.

*United States v. Hernandez*, 941 F.2d 133, 137 (2d Cir. 1991).

However, as the Court of Appeals for the Second Circuit later ruled in

*United States v. Blue*, 78 F.3d 56, 61 (2d Cir. 1996):

> As we did in *Hernandez*, in determining whether or not an area is within the arrestee's "'immediate control,'" *Chimel v. California*, 395 U.S. 752, 763, 89 S.Ct. 2034, 2040, 23 L.Ed.2d 685 (1969) ("constructing that phrase to mean the area from within which he might gain possession of a weapon or destructible evidence"), we consider not only the arrestee's location, but also the nature of any restraints that have been imposed upon the person, *see, e.g., United States v. Berenguer*, 562 F.2d 206, 210 (2d Cir. 1977) (where defendant and companion were shackled to each

other on a bed, billfold on bureau in defendant's apartment was "clearly out of his reach or immediate control"). The officer in *Hernandez* based his need to conduct a cursory inspection of the area within the detainee's immediate control on several articulable factors: (1) the officer was planning to place Barrow directly on the bed after searching it; (2) from her position on top of the mattress, Barrow would have been able to reach the area directly under the outer rim of the mattress if she were left unattended; and (3) because the multi-room apartment contained at least three suspects in addition to Barrow, there was a real possibility that she might be left unattended. *See* 941 F.2d at 135-137.

In contrast, the circumstances in the present case make clear that the interior of Blue's bed was neither within Ogarro's nor Blue's immediate control. As an initial matter, the agents were not planning to place Ogarro or Blue on the bed. Ogarro and Blue were prone on the floor, two feet from the bed, their hands cuffed behind their backs, and guarded by Agent Fernandez who stood over them. Ogarro's and Blue's manacled hands were clearly visible, at all times, to Agent Fernandez. Moreover, the suspects were guarded by additional officers; Agent Bullard was in the doorway, and Agents Koval and Jenkins were in the vicinity conducting the alleged security sweep of the one-room apartment. Given the small size of the one-room apartment and the fact that Ogarro and Blue were secured during the entire time in question, there was no possibility that either one of them could reach deep into the interior of the bed without being stopped by Agent Fernandez or one of the other agents.

The legitimate protective search in *Hernandez* differed in another significant respect from the one conducted here. In *Hernandez*, the search consisted solely of the officer running his hand along the very edge of the area between the mattress and the box spring – the potential grab area of the detainee. By contrast, in this case, Agent Koval lifted the mattress off its box spring to search the area deep within the bed. Clearly, under the combination of circumstances present in this case, such a search extended beyond the area from within which Blue or Ogarro might have gained possession of a weapon. Accordingly, because the protective sweep was overbroad, the district court erred in declining to suppress the firearm on this ground.

-14-

In the case at bar, the "protective sweep" of the bedroom and the closet in the bedroom by S.A. Gillette was merely a "cursory inspection" of those areas for the purpose of determining whether there might be other persons hiding within these areas who could cause harm to the officers.  It was during this "protective sweep" that S.A. Gillette observed the "bullets in plain view on top of a laundry basket in the bedroom." The "backside of a handgun on the top shelf of the closet" was also in "plain view" during the course of his "protective sweep" of that area.

> It has long been settled that objects falling in the plain view of an officer who has a right to be in the position to have that view are subject to seizure and may be introduced in evidence.

*Harris v. United States*, 390 U.S. 234, 236 (1968).

The plain view exception to the Fourth Amendment warrant requirement "authorizes seizure of illegal or evidentiary items visible to a police officer whose access has some prior Fourth Amendment justification and who has probable cause to suspect that the item is connected with criminal activity."  *Illinois v. Andreas*, 463 U.S. 765, 771 (1983).  In accordance with this exception, the warrantless seizure of an item is justified where: (1) the police have lawful access to the place from which the item can be plainly viewed; (2) the item seized is in fact in plain view at the time it is discovered; and (3) it is immediately apparent to the police at the time of discovery that the item constitutes evidence of, an instrumentality of, or fruit of, a crime.  *Horton v. California*, 496 U.S. 128, 136 (1990); *United States v. Kiyuyung*, 171 F.3d 78 (2d Cir. 1999).  To meet the

"immediately apparent" standard, police officers must have probable cause to believe that an object in plain view is contraband without conducting some further search of the object.  *Minnesota v. Dickerson*, 508 U.S. 366, 375 (1993).

Since the officers had lawful access to the premises by reason of the arrest warrant, and since they had a legal right to conduct a "protective sweep" within those premises for the reasons previously stated, the "plain view doctrine" applies to the seizure of the bullets and the weapon observed by S.A. Gillette on the top shelf of the closet since such items constituted "evidence of, an instrumentality of, or fruit of, a crime."  *Horton v. California, supra*; *United States v. Lauter, supra* at 216 (seizure of a weapon).

However, the seizure of the second gun found "underneath a blanket in the closet" by Agent Jay does not fall within the application of the "plain view doctrine." S.A. Gillette testified that Agent Jay retrieved the gun that Gillette had observed in the closet and that while doing so, Agent Jay "found another gun **underneath a blanket**" in the closet.  Since the second weapon seized was underneath a blanket, it apparently was not in "plain view" to S.A. Gillette when he observed the "backside of the hand gun on the top shelf of the closet" and it is reasonable to conclude that such second weapon would not have been in the "plain view" of Agent Jay.  This is especially so since no testimony was elicited from Agent Jay on this point or "as to how [the gun] came to be within his range of vision."  As a result, the government has failed to meet

its burden of establishing that the second gun seized was seized under a valid

exception to the warrant requirement.  *United States v. Kiyuyung, supra* at 83-84.

Any claim by the government that the second weapon seized was done

under the auspices of the "protective sweep" and therefore, legal, must be rejected.  It

is true "that a protective sweep may encompass a search for weapons within the

immediate 'grab area' of a suspect who poses a threat to the safety of law enforcement

officers."  *United States v. Blue, supra* at 59; *United States v. Hernandez, supra* at 137.

In the case at bar, just as in *Blue*, the closet area in the bedroom of the premises at 68

Forman Street was neither within the defendant's nor Blazer's immediate control since

both had been seized in the kitchen and handcuffed and placed on the kitchen floor

under the guard of the arresting officers.  S.A. Gillette and Agent Jay had secured the

area in the bedroom.  As a result, "there was no possibility that [the defendant or

Blazer] could reach [into the bedroom closet] without being stopped by" the agents.

*United States v. Blue, supra* at 60.

Therefore, it is this Court's finding that the seizure of the second gun from

the bedroom closet could not be seized either under the concept of a "protective

sweep" or under the "plain view principle."

### 3.     The Statements By The Defendant:

The defendant argues that "it is clear from the testimony of the three Federal agents [Corrigan, Gillette and Jay] that [the defendant] was seized for 4th Amendment purposes" and therefore, the defendant was subjected to "custodial interrogation" which was "improper in light of the circumstances and that "such questioning was conducted without [the defendant] being advised of his rights pursuant to *Miranda v. Arizona*, 384 U.S. 436."  (Docket #11, p. 8; Docket #6, Attorney's Affidavit, ¶ 11).  He further argues that the questions put to him by Agent Jay "were specific as to the existence of weapons, the existence of which would be criminal in nature" and that this "interrogation was improper in light of the circumstances" and that the "finding of the gun in the bed [2] (sic) was directly related to the custodial interrogation of [the defendant]."  (Docket #11, pp. 8-9).  Lastly, it is asserted by the defendant "that because of the overbroad search under the protective sweep guise, all statements made by [the defendant] should be suppressed."  (Docket #11, p. 9).

### A.     The Interrogation By Agent Jay About Other Weapons:

It was only after S.A. Gillette announced his observation of the "bullets on top of the laundry basket in the bedroom" and the "backside of a handgun on the top shelf of the closet," that Agent Jay, who was guarding the defendant in the kitchen, asked the defendant if there were any other weapons in the house to which the

---

[2] Although the defendant indicated that there was a gun in the area of the bed in the bedroom, no weapon was found in the bed by the agents.  Both weapons seized were found in the closet of the bedroom.

defendant ultimately replied that "there is possibly a weapon in the area of the bed."

Admittedly, no *Miranda* warnings had been given to the defendant prior to this question put to him by Agent Jay. Nevertheless, such question was legitimate since it was done in the context of "officer safety" and, therefore, a recognized exception to the *Miranda* rule. Since an exception to the *Miranda* rule is being applied herein, there is no necessity to consider whether the defendant was in custody when questioned or whether the interrogation by Agent Jay constituted custodial interrogation. "[T]he need for answers to questions in a situation posing a threat to the [officers'] safety outweighs the need for the prophylactic rule protecting the Fifth Amendment's privilege against self incrimination." *New York v. Quarles*, 467 U.S. 649, 657 (1984). This exception has been expressly recognized by the Court of Appeals for the Second Circuit wherein the Court ruled:

> In *New York v. Quarles*, the Supreme Court identified a "narrow exception to the Miranda rule," when arresting officers ask a defendant "questions necessary to secure their own safety or the safety of the public." 467 U.S. at 658-59, 104 S.Ct. 2626. Recently reiterating this principle in *United States v. Reyes*, this court observed that "Miranda warnings need not precede 'questions reasonably prompted by a concern for the public safety' or for the safety of the arresting officers" for a suspect's answers to be admitted as evidence of his guilt. 353 F.3d at 152 (quoting *New York v. Quarles*, 467 U.S. at 656, 104 S.Ct. 2626). The public safety exception to Miranda does not depend upon the subjective motivation of the questioning officer. *See Quarles*, 467 U.S. at 655-56, 104 S.Ct. 2626. Rather, it applies so long as the questioning "relate[s] to an objectively reasonable need to protect the police or the public from any immediate danger." *Id*. at 659 n. 8, 104 S.Ct. 2626; accord

*United States v. Reyes*, 353 F.3d at 154; *United States v. Newton*, 369 F.3d 659, 677-78 (2d Cir. 2004).

In *United States v. Reyes*, 353 F.3d 148 (2d Cir. 2003), the court expressed the basis for the exception to the *Miranda* rule wherein it stated:

> We emphasize, as did the Supreme Court, that the purpose of the public safety exception is to allow officers "to follow their legitimate instincts when confronting situations presenting a danger to the public safety." *Quarles*, 467 U.S. at 659, 104 S.Ct. 2626. There has to be some flexibility in situations where the safety of the public and the officers are at risk.

*Id.* at 155; *See also United States v. Shea*, 150 F.3d 44, 48 (1st Cir. 1998); *United States v. Talley*, 275 F.3d 560, 563-65 (6th Cir. 2001).

The fact that the defendant was handcuffed and lying on the kitchen floor and under the guard of Agent Jay is of no legal effect in this particular instance. The officers had not completed their "protective sweep" of the premises and therefore had not yet determined whether there were additional persons present in the premises who could have access to weapons in the premises and thereby cause harm to the officers present. *United States v. Newton, supra* at 678, n. 7.

Therefore, the defendant's position seeking suppression of his statements under the aforesaid circumstances is without legal merit and should be denied.

**B.     Defendant's Statement That "He Would Take
Responsibility For the Guns:"**

S.A. Corrigan testified that after the defendant was placed under arrest,
he "voluntarily" stated that he "would take responsibility for the guns" and that no
questions had been put to him prior to his making this voluntary statement.  This
testimony of S.A. Corrigan was not contradicted by any evidence presented by the
defendant at the hearing.  As a result, it is the finding of this Court that this statement
made by the defendant was a voluntary and spontaneous one and was not obtained in
violation of *Miranda* or any other legal rights afforded the defendant.


## <u>CONCLUSION</u>

Based on the foregoing, it is the RECOMMENDATION of this Court that
the defendant's motion to suppress use of the first weapon observed and seized from
the bedroom closet in 68 Forman Street as well as the bullets seized from the bedroom
as evidence at trial be DENIED.  It is further RECOMMENDED that defendant's motion
to suppress use of the second weapon seized from the bedroom closet at trial be
GRANTED.  Lastly, it is RECOMMENDED that defendant's motion to suppress use of
any statements made by him at trial be DENIED.


Therefore, it is hereby ORDERED pursuant to 28 U.S.C. § 636(b)(1) that:


This Report, Recommendation and Order be filed with the Clerk of the
Court.

**ANY OBJECTIONS** to this Report, Recommendation and Order must be filed with the Clerk of this Court within ten (10) days after receipt of a copy of this Report, Recommendation and Order in accordance with the above statute, Fed. R. Crim. P. 58(g)(2) and Local Rule 58.2.

The district judge will ordinarily refuse to consider *de novo*, arguments, case law and/or evidentiary material which could have been, but were not presented to the magistrate judge in the first instance.  *See, e.g., Patterson-Leitch Co., Inc. v. Massachusetts Municipal Wholesale Electric Co.*, 840 F.2d 985 (1st Cir. 1988).  **Failure to file objections within the specified time or to request an extension of such time waives the right to appeal the District Judge's Order.**  *Thomas v. Arn*, 474 U.S. 140 (1985); *Wesolek, et al. v. Canadair Ltd., et al.*, 838 F.2d 55 (2d Cir. 1988).

The parties are reminded that, pursuant to Rule 58.2 of the Local Rules for the Western District of New York, "written objections shall specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for such objection and shall be supported by legal authority."  **Failure to comply with the provisions of Rule 58.2, or with the similar provisions of Rule 58.2**

**(concerning objections to a Magistrate Judge's Report, Recommendation and**

**Order), may result in the District Judge's refusal to consider the objection.**


/s/ H. Kenneth Schroder, Jr.
_____
**H. KENNETH SCHROEDER, JR.**
**United States Magistrate Judge**


**DATED:**      **Buffalo, New York**
                **July 5, 2006**